IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mickey Clarence Rosenquist,<br><br>                    Petitioner,<br><br>v.<br><br>Pamala Rider, et al.,<br><br>                  Respondents. | No. CV-13-01103-PHX-DLR (BSB)<br><br>**REPORT AND RECOMMENDATION** |

Mickey Clarence Rosenquist (Petitioner) has filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Amended Petition), arguing that trial counsel was ineffective during a suppression hearing (Ground One), and that his Fourth Amendment rights were violated because evidence was seized during an improper search (Ground Two). (Doc. 17-1.)[1] Respondents argue that Ground One lacks merit and that Ground Two should be dismissed as untimely under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), which provides the statute of limitations applicable to state prisoners seeking federal habeas corpus relief. (Doc. 21.) Alternatively, Respondents argue that Petitioner's Fourth Amendment claim is not cognizable on § 2254 review. (Doc. 21 at 9.) Petitioner opposes Respondents' assertions and argues that he is entitled

---

[1] Petitioner, who is represented by counsel, filed his amended petition for writ of habeas corpus as an exhibit to his "Notice of Filing Amended Petition Under 28 U.S.C. § 2254." (Doc. 17, Ex. 1.) For ease of reference, the Court uses the CM/ECF docket number and page designations to cite to the Amended Petition. (Doc. 17-1.)

1  to relief on the merits of his claims. (Doc. 24.) For the reasons set forth below, the Court
2  recommends that the Amended Petition be denied.

**I.     Factual and Procedural Background**

    **A.     Charges, Trial, and Sentencing**

Petitioner was indicted in the Arizona Superior Court, Maricopa County (trial court) on one count of possession of methamphetamine for sale in an amount over the statutory threshold, a class two felony, in violation of Ariz. Rev. Stat. § 13-3407(A)(2) and (B)(2), one count of possession of equipment or chemicals for the manufacture of methamphetamine, a class three felony, in violation of Ariz. Rev. Stat. § 13-3407(A)(3), and one count of possession of marijuana, a class six felony, in violation of Ariz. Rev. Stat. § 13-3405(A)(1). (Doc. 21, Ex. A at 8-9.)

Before trial, Petitioner moved to suppress evidence obtained during a search of his car. (Doc. 21, Ex. E at 3.) Petitioner argued that the search violated his rights under the Fourth Amendment because it occurred while he was unlawfully detained. (*Id*.) Petitioner also argued that the evidence seized during the search was in admissible as the fruit of an unlawful detention. (*Id.*) The trial court held a suppression hearing at which Phoenix Police Officer Tamara Motyka (Motyka), a convenience store clerk, and Petitioner testified. (Doc. 21, Ex. A at 9.) The trial court found that Motyka did not unlawfully detain Petitioner. (*Id.*) The trial court also found that Petitioner's detention was not "unreasonable or unlawful," and that the police had probable cause to arrest Petitioner after they discovered a black bag containing drugs and drug paraphernalia in his companion's car, in an area where Petitioner had been observed inserting his hands. (*Id.*) The trial court also found that Petitioner had consented to the search of his car. (Doc. 21, Ex. A at 9-10.)

The case proceeded to trial and a jury found Petitioner guilty as charged. (Doc. 21, Ex. A at 10.) The trial court sentenced Petitioner to concurrent aggravated terms of twenty years' imprisonment for the possession of methamphetamine for sale (Count 1), fifteen years' imprisonment for the possession of equipment or chemicals for

the purpose of manufacturing methamphetamine (Count 2), and four-and-one-half years' imprisonment for the possession of marijuana (Count 3). (*Id.*)

### B. Direct Appeal

Petitioner filed a timely direct appeal arguing that the trial court erred by denying his motion to suppress. (Doc. 21, Ex. A.) The Arizona Court of Appeals denied relief on December 23, 2008. (*Id.*)

### C. Post-Conviction Proceedings

On January 12, 2009, Petitioner filed a notice of post-conviction relief pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. (Doc. 21, Ex. B.) He later filed a petition for post-conviction relief asserting that trial counsel was ineffective. (Doc. 17, Ex. R.) The trial court found that Petitioner had not presented a colorable claim for relief and denied post-conviction relief on June 25, 2010. (*Id.*) Petitioner sought review in the Arizona Court of Appeals, which denied review on June 1, 2012. (Doc. 17, Ex. S; Doc. 21, Ex. D.)

### D. Federal Petition for Writ of Habeas Corpus

On May 31, 2013, Petitioner, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court, arguing that trial counsel was ineffective at the suppression hearing (Grounds One and Two), and that trial counsel was ineffective during plea negotiations (Ground Three). (Doc. 1.)

Counsel appeared on Plaintiff's behalf and filed a motion to supplement or amend the petition. (Docs. 4, 5.) On June 12, 2013, the Court denied the motion to supplement or amend without prejudice because it did not comply with LRCiv 15.1. (Doc. 7.) On October 7, 2013, the Court granted Petitioner thirty days to file an Amended Petition in compliance with LRCiv 15.1(b). (Doc. 16.)

On October 22, 2013, Petitioner filed an Amended Petition arguing that trial counsel was ineffective at the suppression hearing (Ground One), and asserting that his Fourth Amendment rights were violated (Ground Two). (Doc. 17-1.)

## II. The AEDPA Limitations Period

### A. Commencement of the Limitations Period

The AEDPA provides a one-year statute of limitations for state prisoners to file a petition for writ of habeas corpus in federal court. 28 U.S.C. § 2244(d)(1). The limitations period generally runs from "the date on which the [challenged state court] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

After his conviction and sentencing, Petitioner sought direct review in the Arizona Court of Appeals, which the court denied on December 23, 2008. (Doc. 21, Ex. A.) Petitioner did not seek review in the Arizona Supreme Court. Accordingly, Petitioner's conviction became final thirty days later, on January 22, 2009, upon the expiration of the time for him to file a petition for review in the Arizona Supreme Court. *See Hemmerle v. Schriro*, 495 F.3d 1069, 1073-74 (9th Cir. 2007) (stating that the petitioner's "direct appeal was final upon the expiration of the time for seeking review of the Court of Appeals' decision in the Arizona Supreme Court."); *see* Ariz. R. Crim. P. 31.19(a) (providing that "[w]ithin 30 days after the filing of a decision . . . any party may file with the clerk of the Court of Appeals a petition for review by the Supreme Court."). Accordingly, absent statutory tolling, the one-year limitations period commenced on January 22, 2009, and expired one year later. However, as discussed below, the limitations period was statutorily tolled until June 1, 2012.

### B. Statutory Tolling

Pursuant to the AEDPA, the one-year limitations period is tolled during the time that a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *see Nino v. Galaza,* 183 F.3d 1003, 1006 (9th Cir. 1999) (stating that an application for collateral review is pending in State court for "all the time during which a state prisoner is attempting, through proper use of state court procedures, to exhaust state remedies with regard to particular post-conviction proceedings."). Here, Petitioner commenced post-

conviction proceedings by filing a notice of post-conviction relief pursuant to Rule 32 on January 12, 2009. *See Isley v. Dep't of Corr.*, 383 F.3d 1054, 1056 (9th Cir. 2004) (holding that that, in Arizona, when a notice of post-conviction is "filed in conformity with the pertinent statutory provisions," it is sufficient to toll the AEDPA statute of limitations.) The trial court denied review and Petitioner appealed. (Doc. 17, Ex. L.) The court of appeals denied review on June 1, 2012 and Petitioner did not seek further review. (Doc. 21, Ex. D.) Accordingly, the statute of limitations was tolled until June 1, 2012 and commenced the next day. *See Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999) (quoting *Barnett v. Lemaster*, 167 F.3d 1321, 1323 (10th Cir. 1999)) (stating that a petition for post-conviction relief is pending for "all the time during which [a petitioner is] attempting, through proper use of state court procedures, to exhaust state remedies with regard to [that] post-conviction application."). Accordingly, his federal petition for writ of habeas corpus was due by June 1, 2013.

### C. Timeliness of the Amended Petition

Petitioner's original petition, filed May 31, 2013, was timely. (Doc. 1.) However, his Amended Petition was filed on October 22, 2013, several months after the limitations period expired. Petitioner argues that, under Rule 15(c) of the Federal Rules of Civil Procedure, the claims in his Amended Petition relate back to his original petition and thus are timely. (Doc. 24 at 1-3.)

Rule 15(c) provides that an "amendment to a pleading relates back to the date of the original pleading when . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading."[2] In *Mayle v. Felix*, 545 U.S. 644 (2005), the Supreme Court explained the relation-back principle in Rule 15(c) in relation to the AEDPA's one-year limitations period. The Court held that new claims relate back to "timely" claims only

---

[2] A petition for writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. In addition, Rule 11 of the Rules Governing Section 2254 Cases provides that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to the petitions filed under these rules."

when such claims are tied to a common core of operative facts. *Id.* at 665. The Court rejected the argument that a common core of operative facts could be interpreted to include all facts arising out of a petitioner's trial, conviction, or sentence. *Id.* New claims supported by facts that differ in both "time and type" from those included in the original petition do not relate back. *Id.* at 650. In contrast, if a new claim merely clarifies or amplifies a claim or theory already in the original petition, it may relate back to the date of the original petition and avoid a time bar. *See Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001).

Here, as Respondents acknowledge, Petitioner's allegations of ineffective assistance of trial counsel asserted in Ground One of the Amended Petition are essentially the same as his allegations of ineffective assistance of counsel raised in the original petition. Thus, Ground One of the Amended Petition relates back to the timely-filed original petition and is considered timely. (Doc. 21 at 7; *compare* Doc. 1 at 6-7 *with* Doc. 17-1 at 7.) Respondents, however, argue without explanation that Petitioner's Fourth Amendment claim asserted in Ground Two of the Amended Petition does not relate back to the original petition and, therefore, is untimely. (Doc. 21 at 7.)

Upon review of the original and amended petitions, the Court concludes that Petitioner's Fourth Amendment claim asserted in Ground Two of the Amended Petition is tied to a common core of operative facts asserted in Ground Two of the original petition. (*Compare* Doc. 1 at 7, *with* Doc. 17-1 at 8.) In both the original and amended petitions, this claim is based on Petitioner's challenge to the evidence that was seized during an alleged illegal detention and search, and his assertion that the evidence should have been suppressed. (*Id.*) Accordingly, the Court finds that Ground Two of the Amended Petition relates back to the original petition and is considered timely.

**III.   Ground One — Ineffective Assistance of Trial Counsel**

In Ground One, Petitioner argues that trial counsel was ineffective for failing to investigate and present evidence to support his motion to suppress evidence found during the search of his car. (Doc. 17-1 at 7.) Petitioner presented this claim to the trial court

and the court of appeals on post-conviction review and it was denied. Respondents agree that Petitioner exhausted this claim of ineffective assistance of counsel,[3] but argue that Petitioner has not shown that the trial court's resolution of this claim is contrary to or based on an unreasonable application of Supreme Court precedent, or that it is based on an unreasonable determination of the facts. (Doc. 21 at 11-12.)

### A.  Federal Review of Claims Adjudicated in State Court

If a habeas petition includes a claim that was "adjudicated on the merits in State court proceedings," federal court review is limited by § 2254(d). Under § 2254(d)(1), a federal court cannot grant habeas relief unless the petitioner shows: (1) that the state court's decision "was contrary to" federal law as clearly established in the holdings of the United States Supreme Court at the time of the state court decision, *Greene v. Fisher*, __ U.S.__, 132 S. Ct. 38, 43 (2011); or (2) that it "involved an unreasonable application of" such law, § 2254(d)(1); or (3) that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(2); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011). This standard is "difficult to meet." *Richter*, 131 S. Ct. at 786. It is also a "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law, courts look exclusively to the holdings of the Supreme Court that existed at the time of the state court's decision. *Greene*, 132 S. Ct. at 44. A state court's decision is "contrary to" federal law if it applies a rule of law "that

---

[3] Generally, a federal court may not grant a petition for writ of habeas corpus unless the petitioner has exhausted available state remedies. 28 U.S.C. § 2254(b). To exhaust state remedies, a petitioner must afford the state courts the opportunity to rule upon the merits of his federal claims by "fairly presenting" them to the state's "highest" court in a procedurally appropriate manner. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

Respondents state that Petitioner properly exhausted his claim of ineffective assistance of counsel asserted in Ground One. (Doc. 21 at 9; Doc. 17, Ex. R at 5, 19; Ex. S at 2-4.) Accordingly, the Court does not further address this issue.

contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v. Esparza*, 540 U.S 12, 14 (2003) (citations omitted).

A state court decision is an "unreasonable application of" federal law if the court identifies the correct legal rule, but unreasonably applies that rule to the facts of a particular case. *Brown v. Payton*, 544 U.S. 133, 141 (2005). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree on the correctness of the state court's decision.'" *Richter*, 131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*

When a state court decision is deemed to be "contrary to" or an "unreasonable application of" clearly established federal law, a petitioner is not entitled to habeas corpus relief unless the erroneous state court ruling also resulted in actual prejudice, as defined in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *Benn v. Lambert*, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). "Actual prejudice" means that the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631.

When a petitioner alleges ineffective assistance of counsel, the court applies the prejudice standard of *Strickland v. Washington*, 466 U.S. 668 (1984), and does not engage in a separate analysis applying the *Brecht* standard. *See Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002) (quoting *Jackson v. Calderon*, 211 F.3d 1148, 1154 n.2 (9th Cir. 2000) (stating that the court "need not conduct harmless error review of *Strickland* violations under *Brecht* . . . because '[t]he; *Strickland* prejudice analysis is complete in itself; there is no place for additional harmless-error review.")).

### B.     Standards to Establish Ineffective Assistance of Counsel

Under *Strickland*, a petitioner must show that counsel's performance was objectively deficient and that counsel's deficient performance prejudiced the petitioner. 466 U.S. at 687. To be deficient, counsel's performance must fall "outside the wide range of professionally competent assistance." *Id.* at 690. When reviewing counsel's performance, the court engages a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The court's review of counsel's performance is extremely limited. Acts or omissions that "might be considered sound trial strategy" do not constitute ineffective assistance of counsel. *Id*.

To establish a Sixth Amendment violation, a petitioner must also establish that he suffered prejudice as a result of counsel's deficient performance. *Id*. at 691-92. To show prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The court need not address both *Strickland* requirements if the petitioner makes an insufficient showing on one. *See id.* at 697 (explaining that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) (stating that "[f]ailure to satisfy either prong of the *Strickland* test obviates the need to consider the other") (citing *Strickland*, 466 U.S. at 688).

### C.     The Motion to Suppress and Hearing

Before trial, Petitioner moved to suppress drugs and drug paraphernalia found in his car. (Doc. 21, Ex. E; Doc. 17, Ex. A at 43.) After a hearing, the trial court held that Petitioner had consented to the search of his car, but it rejected the State's alternate theory that the evidence would inevitably have been discovered through an inventory search of the car. (Doc. 17, Ex. A at 130.) It further held that Petitioner's consent to the

search was voluntary, even though he was in custody. (Doc. 17, Ex. A at 130, Ex. F at 7.)

During the suppression hearing, Motyka testified regarding the search of Petitioner's car and his arrest.[4] (Doc. 17, Ex. A.) She stated that at 7:45 p.m. on October 20, 2004, a convenience store clerk at a service station in Phoenix called 911 and reported that two people on the east side of the building were selling or using drugs. (*Id.* at 6-8.) A few minutes later, Motyka arrived at the scene in her patrol car. (*Id.* at 6, 8.) She noticed two cars, an Altima and a Blazer, parked on the east side of the convenience store. (*Id.* at 4.) Petitioner was standing next to the Altima talking with T.L., who was standing next to the Blazer. (*Id.* at 9.) There were no other cars or people on the east side of the building. (*Id.*)

Motyka testified that she parked her patrol car behind the Blazer in a manner that prevented it from leaving, but that she did not block the Altima. (*Id.* at 9-11, 15-16.) Motyka contacted Petitioner and T.L. (*Id.* at 15.) She told them there had been a complaint that people were selling or using drugs on the east side of the building and asked them what they were doing. (*Id.*) Petitioner and T.L. responded they were "just talking." (*Id.*) Motyka asked them for identification and they produced their driver's licenses, which Motyka kept. (*Id.* at 16-17.) She asked Petitioner and T.L. who owned the cars they were leaning against. (*Id.* at 17.) T.L. responded the Blazer belonged to him. (*Id.*) Petitioner stated he did not know who owned the Altima, but suggested it probably belonged to a customer inside the store. (*Id.*)

When no one exited the store to claim the Altima, Motyka again asked Petitioner who owned the car. (*Id.* at 18-19.) He replied that it belonged to his girlfriend who was inside the store. (*Id.* at 19.) During this conversation, Petitioner put his hands in his

---

[4] The description of Motyka's testimony at the suppression hearing is based on the Arizona Court of Appeals' decision affirming Petitioner's conviction and on the transcript of that hearing. (Doc. 21, Ex. A.) Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." This includes findings of fact by an appellate court. *See Sumner v. Mata,* 449 U.S. 539, 546-47 (1981); *Runningeagle v. Ryan,* 686 F.3d 758, 763 n.1 (9th Cir. 2012).

- 10 -

1 pockets several times. (*Id.* at 21.) Motyka asked Petitioner to keep his hands out of his
2 pockets where she could see them. (*Id.*) Petitioner responded he was nervous because
3 "he was on bond for $25,000 . . . for a big drug case." (*Id.* at 19.) Petitioner did not ask
4 to leave or tell Motyka that he needed to leave. (*Id.* at 22.)

5       While Motyka was talking to Petitioner and T.L., police dispatch broadcasted a
6 notice of an accident at the intersection where the service station and convenience store
7 were located. (*Id.* at 18.) Motyka noticed a truck in the street east of the service station
8 that appeared to have been involved in an accident. (*Id.* at 24.) Petitioner and T.L. heard
9 the broadcast. (*Id.* at 23-24.) Petitioner then stated that he and T.L. had been standing in
10 the service station parking lot when Motkya arrived because they had witnessed the
11 accident and were waiting to talk to the police about it. (*Id.* at 24.) Because the truck
12 appeared to be blocking traffic, Motyka walked from the service station parking lot east
13 to the sidewalk and instructed the driver to pull to the side of the road. (*Id.* at 25.)
14 During this time, Motyka had her back to Petitioner and T.L. for approximately five to
15 ten seconds. (*Id.* at 26.) Otherwise, she positioned herself where she could see Petitioner
16 and T.L. while she dealt with the accident. (*Id.*) After she told the driver of the truck to
17 move his vehicle off of the road, Motyka noticed that Petitioner and T.L. had moved. (*Id.*
18 at 27.) T.L. was standing by the Altima and Petitioner was "crouching down" near the
19 front of the Blazer "between the edge of the wheel well and the front bumper" with his
20 hands "tucked" underneath the grill area "[p]retty much all the way up to his elbows."
21 (*Id.* at 27-29.)

22       After she finished talking to the truck driver, Motyka walked back to her patrol car
23 to check Petitioner's and T.L.'s driver's license information on her computer. (*Id.* at 31.)
24 By this time, Petitioner was no longer crouched down but was standing next to the
25 Blazer. (*Id.*) As Motyka started to sit down in her patrol car, Petitioner and T.L.
26 approached her. (*Id.*) She instructed them to go back and stand by their cars. Petitioner
27 and T.L. initially complied, but then approached the patrol car two or three times, each
28 time receiving the same request from Motyka to return to their cars. (*Id.*)

At 7:54 p.m., Motyka. entered T.L.'s driver's license information on the computer in her patrol car and discovered he was the subject of a misdemeanor arrest warrant. (Doc. 17, Ex. A at 35.)  At 7:55 p.m., Motyka entered Petitioner's driver's license information on the computer. (*Id.*)  Earlier, Petitioner had told Motyka that the address on his license was not current and he provided her with his new address. (*Id.* at 37.)  At some point, Motyka discovered that the Altima was registered to an address on the same street, and she asked Petitioner who had driven the car to the store. (*Id.*)  He responded he had driven the car there, and admitted that he lived at the address on the Altima's registration. (*Id.* at 38.)

Backup officers arrived on the scene and T.L. was arrested pursuant to the outstanding misdemeanor warrant at 7:58 p.m. (*Id.*)  Motyka and other officers then conducted an inventory search of T.L.'s Blazer and discovered a black bag between the bumper and grill in the area where Motyka had earlier seen Petitioner place his hands while he was crouched down near the front of the Blazer. (*Id.* at 42.)  Motyka opened the black bag and found "a large quantity of methamphetamines, or basically freshly cooked or freshly manufactured methamphetamines" in "a couple of big chunks" that were "still wet" and located "in a baggie." (*Id.* at 42-43.)  The black bag also contained "a small quantity of marijuana and a scale." (*Id.* at 43.)

While police searched the Blazer, Petitioner sat on a curb in the parking lot. (*Id.* at 41.)  An officer stood beside him. (*Id.*)  Sometime during the search of the Blazer, Plaintiff was handcuffed, but was not told he was under arrest. (*Id.* at 41.)  After Motyka found the black bag in the Blazer, she went to the curb to speak with Petitioner. (*Id.* at 42.)  She did not mention that the police had found the black bag, and she did not know if Petitioner had seen them find the bag because the Altima was situated between the curb where Petitioner was sitting and the Blazer. (*Id.* at 44.)  Motyka testified that she asked Petitioner if he was in possession of any drugs and he said no. (*Id.*)  She then asked him if there were any drugs in the Altima, and he responded, "there shouldn't be." (*Id.* at 45.)  Motyka requested permission to search the Altima, and Petitioner replied "go ahead."

(*Id.*)  Another officer, Marrero, called for a drug canine at 8:07 p.m., but was told that no canine was available.  (*Id.* at 46-47, 68.)  Motyka testified that Petitioner told the police they "could either wait for the dog or . . . go ahead and check his car without the dog." (*Id.* at 46-47.)  The police obtained Petitioner's keys and searched the passenger compartment of the Altima, discovering three boxes of an over-the-counter drug containing ephedrine.  (*Id.* at 47.)  The officers attempted to search the trunk of the car, but the interior release latch for the trunk did not work.  (*Id.* at 48.)  After a few minutes, a police officer was able to open the trunk with the key.  (*Id.* at 48-49.)  Inside, police discovered a backpack containing "a bunch of small Ziploc baggies, which are very common in the packaging . . . of methamphetamines and other drugs," and "55 blister packs containing 24 pills of nasal decongestant that contains ephedrine."  (*Id.* at 49-50.) According to the police report, police arrested Petitioner at 8:10 p.m.  (*Id.* at 52.)

Petitioner also testified at the suppression hearing.  (*Id.* at 95.)  He testified that he did not feel free to leave because his car was blocked by Motyka's patrol car and because she had taken his identification.  (*Id.* at 99, 107.)  He also testified that he responded no when asked if police could search his car.  (*Id.* at 102, 105.)  He also testified that he told the police he would wait for a drug dog.  (*Id.* at 105, 113.)  He stated that he did not consent to having his car searched, but said he would wait for a drug dog.  (*Id.* at 106.) He testified that he was not told he was under arrest at the scene.  (*Id.*)

### D.     Counsel's Performance at the Suppression Hearing

Petitioner argues that trial counsel's performance was deficient at the suppression hearing because she "failed to conduct any witness or officer interviews until months after the suppression hearing."  (Doc. 17-2 at 19.)[5]  He also contends that trial counsel "failed to bring in any contradictory statements of other officers from the grand jury testimony or their reports."  (*Id.* at 19.)

---

[5]  Exhibit 2 to Docket 17 is an "Attachment" to the Amended Petition containing Petitioner's "facts, arguments, and citations of law in support of his Amended Petition." For ease of reference, the Court uses the CM/ECF docket number and pagination to cite to this document.  (Doc. 17-2.)

### 1. Position of Patrol Car

Petitioner first argues that trial counsel was deficient for failing to challenge Motyka's "version of events," particularly, where her patrol car was parked in relation to Petitioner's and T.L.'s cars. (Doc. 17-2 at 17.) He argues that trial counsel was deficient for failing to investigate and present the testimony of another Phoenix Police Officer, Roestenberg, who during a pretrial interview and at trial gave testimony that contradicted Motyka's testimony that her patrol car did not block Petitioner's car. (*Id.*) Petitioner asserts that, during a pretrial interview, Roestenberg "drew a sketch of where the three vehicles were positioned when he arrived on scene, [depicting] Motyka's vehicle partially blocking both [cars] from leaving." (*Id.*) He also states that, at trial, Roestenberg testified that Motyka's patrol car "was partially parked behind both the Altima and the Blazer." (Doc. 17-2 at 17 (citing Doc. 17, Ex. F at 86).)

However, the "sketch" to which Petitioner refers does not clearly depict the location of Motyka's patrol car because it does not specifically identify her car. (Doc. 17, Ex. D.) Additionally, during the pretrial interview in which he drew the sketch, Roestenberg stated that Motyka "was parked in the east parking lot and she was facing west. In relation to the other vehicles I would have to estimate anywhere from twenty to thirty feet. *I don't know which vehicle she was directly behind.*" (Doc. 17, Ex. E (emphasis added).)[6] Considering Roestenberg's lack of certainty regarding the positioning of the three vehicles at the scene, Petitioner has not shown that trial counsel was ineffective for failing to present his testimony during the suppression hearing.

Additionally, during the suppression hearing, trial counsel introduced a police report in which Motyka stated that when she pulled into the convenience store parking lot, "parked in the spaces directly in front of [her] were two vehicles. One was a white Nissan Altima, the other was a Black Chevy Blazer." (*Id.* at 73.) Trial counsel also

---

[6] Petitioner's Exhibit E is one page of an interview transcript. The speakers are identified only by their initials, and the date of the interview is not indicated. Although Respondents did not have a copy of that transcript, in their Answer, they did not dispute that Roestenberg is the person being interviewed. (Doc. 21 at 13 n.3.)

- 14 -

elicited testimony from Petitioner that Motyka's patrol car blocked his car. (*Id.* at 99, 107.)

Thus, during the suppression hearing, trial counsel addressed the ambiguity regarding the positioning of the three cars, and Petitioner has not shown that trial counsel was deficient for failing to introduce other evidence regarding the positioning of the cars. Moreover, the trial court held that the position of Motyka's patrol car was irrelevant, and that "there was no seizure regardless of the position of the vehicle." (Doc. 17, Ex. A at 130.) The trial court found Motyka's conduct on her arrival, and her approach to Petitioner and T.L., constituted reasonable investigatory action. (*Id.*) Thus, Petitioner has not shown that, but for trial counsel's failure to introduce further testimony regarding the position of the patrol car, there is a reasonable probability that the result of the suppression hearing would have been different.

### 2. Time of Arrest

Petitioner also argues that trial counsel was deficient for failing to introduce evidence regarding a discrepancy about the time that he was arrested. (Doc. 17-2 at 17.) During the suppression hearing, Motyka testified that her police report identifies the time of arrest as 8:10 p.m. (Doc. 17, Ex. A at 52.) Petitioner argues that trial counsel was deficient for failing to introduce a police report (DR2004-42005399) prepared by Officer Brian Esperum that identifies the time of arrest as 7:46 p.m., which is the time Motyka arrived on the scene. (Doc. 17, Ex. J; Doc. 17-5 at 46, 51.)[7] That report indicates that Esperum was not at the scene, but that he "responded to the Maryvale Precinct regarding a methamphetamine investigation that was initiated by patrol officers." (Doc. 17-5 at 46, 57.) Thus, his report of the time of the arrest was based on second-hand information and had limited value. Even assuming that trial counsel was deficient at the suppression hearing for failing to present the time of arrest contained in Esperum's report, Petitioner

---

[7] Exhibit J includes several different police reports, each of which is numbered separately. To avoid confusion, the Court uses the CM/ECF docket number and pagination to refer to exhibit J. (Doc. 17-5.)

- 15 -

1    has not shown that, but for counsel's failure to do so, there is a reasonable probability that
2    the outcome of the suppression hearing would have been different.[8]

### 3.      Consent to Search

Petitioner also asserts that trial counsel was deficient at the suppression hearing for failing to present testimony from other police officers, which he claims would have conflicted with Motyka's testimony that Petitioner consented to the search of his car. (Doc. 17-2 at 18.) Particularly, he stresses that Esperum stated in his report (Doc. 17-5 at 46), and testified at trial, that the officers conducted an inventory search of Petitioner's car, and that Esperum does not state that Petitioner consented to the search. (*Id.* at 18.)

Esperum, however, was not at the scene. (Doc. 17-5 at 46.) Thus, his opinion regarding whether Plaintiff consented or whether the search was an inventory search was based on second-hand information and had limited value. Additionally, during the suppression hearing, trial counsel cross-examined Motyka, and elicited testimony from Petitioner regarding the sequence of the events, including when Petitioner's car was searched. (Doc. 17, Ex. A.) At the suppression hearing, Motyka testified that Esperum's report wrongly stated that an inventory search was conducted, and she testified that the search was based on Petitioner's consent. (*Id.* at 89-90.) Additionally, the trial court asked Motyka, "what made you think you could search the Altima?" (Doc. 17, Ex. A at 52.) She responded that, "[Petitioner] told us that we could search the Altima, and ultimately it would have been an inventory search also." (*Id.*) In response to the trial court's further questions, Motyka stated that she was unsure about the "exact sequence" of some events, including whether Petitioner was in "custody" before or after his car was searched. (*Id.* at 52-53.)

Thus, the issue of whether the search of Petitioner's car was an inventory search or a search pursuant to Petitioner's consent was fully litigated at the suppression hearing.

---

[8] Petitioner's entire argument regarding the time of arrest states, "[c]uriously, in the police report, [Petitioner's] time of arrest was recorded on October 2, 2004 at approximately 19:46 hours (7:46 p.m.), which is approximately the same time that Sergeant Motyka arrived on the scene, not when [Petitioner] was cuffed and set on the curb." (Doc. 17-2 at 17.)

- 16 -

1  Even assuming that trial counsel was deficient for failing to present Esperum's statements
2  that the search was an inventory search, Petitioner has not shown that, but for trial
3  counsel's deficient performance, there is a reasonable probability that the result of the
4  suppression hearing would have been different. *See Jackson v. Calderon*, 211 F.3d 1148,
5  1155 n.3 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 697) (stating that the court may
6  proceed directly to the prejudice prong).

Petitioner also claims that trial counsel was ineffective for failing to present Officer Marrero as a witness at the suppression hearing. Plaintiff contends that Marrero stated in a pretrial interview that Petitioner consented to a drug dog searching his car, but that he did not consent to a search by officers. (Doc. 17-2 at 18.) However, the portion of Marrero's interview that Petitioner cites does not contradict Motyka's testimony that Petitioner consented to the search of his car. (Doc. 17, Ex. G.)[9] During his interview, Marrero testified that "one of the officer[s] said something to the effect that there was going to be a drug dog searching the vehicle and [Petitioner] said that was fine." (*Id.*) Marrero, however, did not address whether Petitioner consented to any other type of search. (*Id.*) Thus, Marrero's statement about Plaintiff's consent to a drug-dog search did not contradict Motyka's testimony that Petitioner consented to the search of his car by a drug dog or by officers. Thus, Petitioner has not shown that trial counsel was deficient for failing to call Marrero as a witness during the suppression hearing, or that but for counsel's failure to do so, there is a reasonable probability that the result of the suppression hearing would have been different.

### 4.     Petitioner has not Established Ineffective Assistance of Counsel

Therefore, Petitioner has not shown that trial counsel performed deficiently at the suppression hearing. As set forth above, the evidence he claims should have been presented at the suppression hearing either would not have contradicted Motyka's

---

[9] Petitioner's Exhibit G is one page of an interview transcript. The speakers are identified only by their initials, and the date of the interview is not indicated. Respondents state that they did not have a copy of this transcript, but, in their Answer, they did not dispute that Marrero was the person being interviewed. (Doc. 21 at 13 n.3.)

- 17 -

testimony regarding the events leading to up Petitioner's arrest and the search of his car, or was duplicative of testimony that was presented at the suppression hearing. Even if trial counsel's performance was deficient as Petitioner alleges, Petitioner has not shown that he was prejudiced. Accordingly, he cannot establish that the trial court's resolution of his claim of ineffective assistance of trial counsel was contrary to or based on an unreasonable application of *Strickland*. Additionally, Petitioner has not shown that the trial court's resolution of that claim was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

**IV.     Ground Two — Fourth Amendment Violation**

In Ground Two, Petitioner asserts a violation of his Fourth Amendment right to be free from unreasonable search and seizure. (Doc. 17-1 at 8, Doc. 17-2 at 20-26.) Petitioner argues that evidence seized from his Altima and T.L's Blazer should have been suppressed because he was detained without reasonable suspicion, and he did not consent to the search. (Doc. 17-2 at 20-26.) Respondents assert that because Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in state court, that claim is not cognizable on § 2254 review. (Doc. 21 at 7-8.) As discussed below, the Court agrees with Respondents' assertion.

"If the state has provided a state prisoner an opportunity for full and fair litigation of his Fourth Amendment claim, [a federal court] cannot grant federal habeas relief on the Fourth Amendment issue."[10]  *Moormann v. Schriro*, 426 F.3d 1044, 1053 (9th Cir. 2005) (citing *Stone v. Powell*, 428 U.S. 465, 494 (1976)). "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do

---

[10] Petitioner argues that his Fourth Amendment claim is cognizable on habeas corpus review because he alleges that trial counsel was ineffective in relation to the suppression hearing. (Doc. 24 at 4 (citing *Kimmelman v. Morrison*, 477 U.S. 365 (1986).) In *Kimmelman,* the Court held that the restrictions on federal habeas review of Fourth Amendment claims announced in *Stone v. Powell*, 428 U.S. 465 (1976), do not extend to Sixth Amendment claims based on counsel's alleged ineffective assistance related to the suppression of evidence. *Kimmelman* did not hold that such an allegation of ineffective assistance of counsel also allows for federal habeas corpus review of an independent claim asserting a Fourth Amendment violation.

so or even whether the claim was correctly decided." *Ortiz–Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir.1996).

The record of the state proceedings shows that Petitioner not only had a full and fair opportunity to litigate his Fourth Amendment claim, but that he actually did so. Petitioner raised his Fourth Amendment claim in a pre-trial motion to suppress (Doc. 21, Ex. E.), and the trial court held an evidentiary hearing on the issue. (Doc. 17, Ex. A.) Petitioner, a convenience store clerk, and Motyka testified at the hearing. (*Id.*) Petitioner had the opportunity to present evidence and to cross-examine witnesses. (*Id.*) At the conclusion of the hearing, the trial court ordered additional briefing on the issue of consent. (Doc. 17, Ex. A at 134-36.) The trial court subsequently denied the motion to suppress. (Doc. 17, Ex. B.)

Thereafter, Petitioner raised his Fourth Amendment claim on direct appeal (Doc. 17, Ex. Q), and court of appeals affirmed in a memorandum decision. (Doc. 21, Ex. A.) Petitioner extensively briefed the Fourth Amendment issue before the trial and appellate courts and had an evidentiary hearing on his motion to suppress. The record reflects that Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim. That claim is therefore barred by the holding in *Stone* and is not cognizable on federal habeas review. *See Gordon v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990) ("Given that [the petitioner] had an opportunity in state court for 'full and fair litigation' of his fourth amendment claim, the Constitution does not require the [the petitioner] be granted habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.").

**V.     Conclusion**

The Court recommends that Petitioner's Amended Petition for habeas corpus relief be denied because he has not shown that the state court's rejection of his claim of ineffective assistance of trial counsel (Ground One) was based on an unreasonable determination of the facts, or that it was contrary to, or a based on an unreasonable application of, controlling Supreme Court precedent. In addition, the Amended Petition

1  should be denied because Petitioner's Fourth Amendment claim (Ground Two) is not
2  cognizable on habeas corpus review.
3      Accordingly,
4      **IT IS RECOMMENDED** that the Amended Petition for Writ of Habeas Corpus
5  (Doc. 17-1) be **DENIED.**
6      **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and
7  leave to proceed in forma pauperis on appeal be **DENIED** because Petitioner has not
8  made a substantial showing of the denial of a constitutional right.
9      This recommendation is not an order that is immediately appealable to the Ninth
10 Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate
11 Procedure 4(a)(1), should not be filed until entry of the District Court's judgment. The
12 parties have fourteen days from the date of service of a copy of this recommendation
13 within which to file specific written objections with the Court. *See* 28 U.S.C.
14 § 636(b)(1); Fed. R. Civ. P. 6 and 72. Thereafter, the parties have fourteen days within
15 which to file a response to the objections. Failure to file timely objections to the
16 Magistrate Judge's Report and Recommendation may result in the District Court's
17 acceptance of the Report and Recommendation without further review. *See United States*
18 *v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to file timely objections to
19 any factual determination of the Magistrate Judge may be considered a waiver of a
20 party's right to appellate review of the findings of fact in an order or judgment entered
21 pursuant to the Magistrate Judge's recommendation. *See* Fed. R. Civ. P. 72.
22     Dated this 31st day of July, 2014.

                                                            _____
                                                            Bridget S. Bade
                                                          United States Magistrate Judge